# In re Moon Nurseries, Inc.

*Ralph E. Kates,* for Commonwealth.

*Robert J. Sugarman,* of *Dechert, Price & Rhodes,* for appellant.

BROUGHTON, Chairman of the Board, December 31, 1973.—This matter is before the board on appeals filed by Moon Nurseries, Inc. (Moon) and BACS Realty, Inc. (BACS) from an order of the Department of Environmental Resources (department), dated October 31, 1972. By this order Moon and BACS were denied permission to connect 18 proposed homes in two subdivisions which they jointly developed, situate in the Township of Lower Makefield, to the sanitary sewer system of the Municipal Sewer Authority of the Township of Lower Makefield.

A hearing was held on March 20, 1973, by Gerald H. Goldberg, Esq., who was formerly a member of this board.

The board makes the following

## FINDINGS OF FACT

1. Moon is a corporation engaged in the custom building of homes in the Township of Lower Makefield, Bucks County, Pa.

2. In the type of business conducted by Moon, building permits for construction cannot be sought until such time as Moon has sold a particular lot and determined with its purchaser the type of dwelling to be erected thereon.

3. Sometime prior to July, 1970, Moon applied to the Township Planning Commission for approval of subdivision of certain tracts of land in the township which Moon owned. These tracts upon which resi-

dence dwellings were to be constructed were named Homestead Acres and Wynnewood II.

4. On or about July 14, 1970, the Municipal Sewer Authority of the Township of Lower Makefield (authority) filed an application, no. 0970423, with the department for a permit which would authorize the construction of sewage conveyance facilities to serve the homes to be constructed in Homestead Acres and Wynnewood II.

5. This application disclosed that the sewage which would be collected in these proposed sewage conveyance facilities would be transported to the sewage treatment plant of the Municipal Authority of the Borough of Morrisville (Morrisville Plant) for treatment.

6. In a letter dated November 13, 1970, the department notified the authority, in writing, that:

a. Conditions were such at the Morrisville Plant that said plant would exceed its hydraulic capacity within the next five years.

b. Application no. 0970423 would be refused unless the Municipal Authority of the Borough of Morrisville (Morrisville Authority) submitted an approvable time schedule, indicating that said plant would be expanded and in operation prior to the anticipated point of hydraulic and/or organic overload.

c. If no such approvable time schedule was received from the Morrisville Authority, the authority could withdraw its application, or revise its application to provide for capped sewers, or request that its application be processed under the circumstances which then existed.

7. On November 24, 1970, the planning commission sent written notice to Moon that its final subdivision plans would be recommended to the township supervisors for approval, subject, inter alia, to approval by

44

the authority and to the granting of a permit by the Commonwealth before houses were constructed.

8. On December 23, 1970, the department sent written notice to the Morrisville Authority by which the Morrisville Authority was informed that no further sewer extensions would be recommended for approval until the department received an acceptable Project Status Schedule Card (PSS Card) from the Morrisville Authority showing the steps to be taken in the expansion of the Morrisville Plant to prevent future sewage treatment deficiencies.

9. On December 31, 1970, the department received a PSS Card from the Morrisville Authority, which PSS Card was found to be acceptable by the department on a date subsequent thereto.

10. On August 13, 1971, the department issued Water Quality Management Permit No. 0970423 to the authority by the terms of which the authority was authorized to construct pump stations, sewers and appurtenances and to discharge treated sewage as per its earlier application.

11. On August 19, 1971, the township supervisors sent a letter to Moon in which, inter alia, Moon was notified that said permit pertaining to its developments had been granted by the department.

12. Moon assigned certain of the lots contained in Homestead Acres to BACS as part of an agreement under which Moon and BACS became obligated to jointly improve and develop Homestead Acres.

13. Between August 19, 1971, and September 19, 1973, Moon and BACS incurred expenses for on-site improvements at Homestead Acres in the sum of $194,790.56. Of this sum, $44,024.78 was spent for the construction of sanitary sewers in Homestead Acres.

14. During 1972, the hydraulic and organic overloading of the Morrisville Plant continued unabated.

15. On September 19, 1972, the department issued an order to the authority in which the department imposed a sewer connection ban into that part of the authority's sanitary sewer system from which sewage was transported to the Morrisville Plant with the exception that said ban did not apply to connections to approved sewers serving new construction for which building permits had been previously issued.

16. On October 4, 1972, Moon applied to the department for an exception to this sewer connection ban.

17. On October 31, 1972, the department rejected this request for an exception.

18. BACS, Moon and the department stipulated that the issues in the appeal of Moon are identical to those which would be involved in the appeal of BACS and that both appeals should be consolidated for hearing and adjudication.

19. The parties hereto have stipulated that the validity of the order by which said sewer connection ban was imposed is not in issue in these appeals.

20. There are 16 lots in Homestead Acres out of a total of 31 lots therein which are adversely affected by this sewer connection ban.

21. There are two lots in Wynnewood II out of a total of 13 lots therein which are adversely affected by this sewer connection ban.

22. On-site improvements for the two lots in Wynnewood II which are adversely affected by this sewer connection ban were made prior to November 1970.

23. Of the total of 18 lots in Homestead Acres and Wynnewood II which are adversely affected by this sewer connection ban, one lot, situate in Homestead Acres, meets department criteria for the installation of an on lot sewage disposal system.

14. Neither Moon nor BACS presented evidence

which would entitle either or both of them to an exception from this sewer connection ban under the existing policies and procedures of the department.

25. If Moon and BACS are permitted to build homes on the 18 lots which are adversely affected by this sewer connection ban and to connect said homes to the existing sewers, there will be an increase in flow to the Morrisville Plant.

## DISCUSSION

The department, on page 900-9.2 of its Sanitary Engineering Policy and Procedures Manual, has delineated the types of situations which must exist before the department will consider the granting of exceptions to sewer connection bans. They are as follows:

1. Where a building permit for new construction was issued by the municipality prior to or on the date of receipt of the ban.

2. Where the connection will serve an existing occupied dwelling built prior to the date of receipt of the ban.

3. Where the connection will result in no increase in sewer flows to the overloaded facilities.

This board has been called upon to hear numerous cases wherein builders, developers and individual property owners have appealed from decisions wherein the department has denied requests for exceptions to sewer connection bans.

In one such case, In the Matter of Alan Mitchell Corporation, docket no. 71-108 (decided June 7, 1972), where appellants argued that they were denied equal protection of the law, in violation of the United States Constitution, when exceptions were granted to some but refused to some, we stated, at page 6, that the law requires only that where classifications are made, they must have some reasonable basis for the different

treatment accorded. We held, page 6, that exceptions as established by the department were fair and reasonable and were proper in substantive content.

In F. & T. Construction Company, Inc. v. Department of Environmental Resources, 6 Comm. 59, 293 A. 2d 138 (1972), the Commonwealth Court held that where the department had established the date of issuance of a building permit as the cut-off date for allowing an "exemption" to the sewer connection ban, such cut-off date was a reasonable standard.

We have, however, discovered that the department will, under certain circumstances, recognize exceptions based on facts other than those set forth in its Sanitary Engineering Policy and Procedure Manual.

In In the Matter of Mrs. Elsie Strawley, docket no. 71-109 (decided May 8, 1972), we found that the department would recognize an exception to a sewer connection ban where a delay in granting a building permit, which would otherwise have been granted before the imposition of such ban, was caused by governmental action for which the applicant for an exception was not responsible. Similarly, in In the Matter of Alan Mitchell Corporation, docket no. 71-108 (decided June 7, 1972), we received testimony from the department from which we made a finding that the department would recognize an exception to a sewer connection ban where a delay in the granting of the application to connect to a sewer system was caused by the government itself, prior to the imposition of the ban.*

Furthermore, we have held that we have the authority to grant exceptions not previously recognized by the department.

---

* In the Matter of Application of Alan Mitchell Corporation, supra, finding of fact no. 7, p. 2.

In In the Matter of Township of Nether Providence, Delaware County, docket no. 71-107 (decided May 8, 1972), we held that where homes were constructed and occupied prior to the issuance of the sewer connection ban, and continued use of malfunctioning on lot sewage disposal systems servicing said homes has caused and will continue to cause an immediate and serious hazard to public health, it would be irresponsible to deny these homeowners the opportunity to connect to the sanitary sewers solely in order to preserve inviolate the terms of the ban.

We reached the conclusion in the Alan Mitchell case supra, at page 7, that "the Board alone, governed by settled equitable principles, may grant an exception not specifically and previously authorized by Department regulations."

We applied this conclusion in In the Matter of David C. Starr, 59 D. & C. 2d 597, when we granted an exception to a property owner whose building was connected to the sewer system before the imposition of a sewer connection ban but not occupied prior thereto.

We found, in that case, that there was no equitable distinction between an exception granted because a building permit was issued prior to the ban and a case where a building was built and connected but unoccupied.

We also took the opportunity in the David C. Starr Case, supra, to again state that we could grant an exception to a sewer connection ban where the facts presented by the person or entity seeking same indicated a situation which was equitably indistinguishable to exceptions granted by the department as a matter of policy.

We now reach the merits of the instant case.

We have made a finding that neither Moon nor BACS have presented evidence which would entitle

either or both of them to an exception from this sewer connection ban under the existing policies and procedures of the department.

What remains for us to determine, therefore, is whether these entities have presented facts which would lead us to conclude that an exception should be granted on the theory that their circumstances are equitably indistinguishable from circumstances under which the department will grant an exception as a matter of policy.

We understand Moon and BACS to be contending, first, that by the very nature of their home building operation, they were precluded from obtaining building permits prior to the date when this sewer connection ban was imposed. They distinguish this circumstance from the situation where some entity, not a custom builder of homes, could have sought and obtained building permits soon after receipt of subdivision approval and sewer extension and construction authorization. They also allege, in support of their first contention, that by the very nature of their business they were required to spend considerable sums in site preparation prior to finding a purchaser. They allege that the amount of this investment may be much greater than that of a contractor who, before he finds a purchaser, prepares the site, obtains building permits and completes his construction.

They assume that the reason why the department will consider an exception when a building permit has been obtained prior to the imposition of the ban is that the department has recognized the fact that a builder has made a substantial commitment in reliance upon his building permit. Moon and BACS reason that they have made as much, if not more of a commitment, in reliance upon the fact that they were notified by the township that the department had is-

sued Water Quality Management Permit no. 0970423 to the authority, by the terms of which the authority was authorized to construct pump stations, sewers and appurtenances and to discharge treated sewage to the waters of the Commonwealth.

This leads the board to the second contention made by Moon and BACS. The parties hereto have stipulated that said Water Quality Management Permit was issued to the authority on August 13, 1971, by the department. They have also stipulated that on August 19, 1971, Moon was notified by the township that said permit had been granted. They have further stipulated that between August 19, 1971, and September 19, 1972, the date when the ban was imposed, Moon and BACS spent almost $195,000.00 for site improvements at Homestead Acres, including the sum of $44,024.78 to construct sanitary sewers.

Moon and BACS contend that they had a vested right to rely on the fact that said Water Quality Management Permit had been granted. They contend that such vested right cannot lawfully be impaired or destroyed by the department some 13 months after this permit was granted. They contend that there is no rational difference between the granting of an exception based upon the existence of a building permit which was issued prior to the ban and the granting of an exception based upon the existence of a Water Quality Management Permit to construct sewers and to discharge sewage therefrom, which was also issued prior to the ban. They allege that there would be no more harm to the waters of the Commonwealth if their request would be granted, than there would be in the case where an exception would be granted to someone with a pre-existing building permit, since in both cases there would be additional flows of sewage to the already overloaded plant.

We have considered the first contention and we

hold that this board will not create a new ground for an exception to a sewer connection ban based upon the distinction between a custom home building operation and an operation which is not, or based alone upon the ordinary ramifications of that distinction. In the first place we would be "opening the Door" to a plethora of claims of home builders who, for obvious reasons, would insist that no sewer connection ban would ever be applicable to them because they were custom home builders. Such claims could certainly defeat the purpose for which the ban was intended and could lead to great confusion and uncertainty. In the second place, we are persuaded that a custom home builder should be held to the date when a building permit is granted in determining whether an exception is granted to him since he certainly has an opportunity to find his purchasers at a stage no earlier in his development plans than his noncustom home builder counterpart.

The second contention by Moon and BACS could, perhaps, have merit. It could very well be that in this particular circumstance, Moon and BACS have a case for an exception which is equitably indistinguishable to exceptions granted by the department as a matter of policy.

We cannot, however, thoroughly evaluate this contention for the reason that we deem the record to be incomplete. We have several questions, unanswered on the record, the answers to which we deem necessary to a proper adjudication of this matter. They are as follows:

1. Did Moon and BACS have evidence prior to August 19, 1971, that there were serious problems at the Morrisville Plant which could affect future connections to sewers in the township which Moon and BACS agreed to build to serve Homestead Acres?

2. What events took place between August 13,

1971, and September 19, 1972, which caused the department to decide, in effect, to change its earlier decision to permit the construction of new sewers in the township, the sewage from which would be carried to the Morrisville Plant?

3. Did Moon and BACS know or should they have known, in the exercise of reasonable diligence and business judgment, that conditions and circumstances at the Morrisville Plant had changed so radically between August 13, 1971, and September 19, 1972, so as to warrant the imposition of this ban despite the submission of the PSS Card which apparently satisfied the department?

4. What was the intention of the department when it granted this Water Quality Management Permit to the authority, and, has the department in other cases imposed a sewer connection ban after it has, only 13 months earlier, permitted the construction and, presumably, the utilization of sewers in the area included under the ban?

5. Was there any governmental action or bad faith in this matter which has seriously prejudiced Moon and BACS?

Although we realize that the burden was on Moon and BACS to show why they are entitled to an exception to this ban, see F. & T. Construction Company v. Department of Environmental Resources. supra, 293 A. 2d. 138, 140, we will permit a rehearing in this matter in order to bring onto the record the answers to these questions. This rehearing will be limited to the receipt of evidence, from each party, which will provide these answers to the board and it should be held promptly.

We will, following the receipt of the transcript of the testimony introduced at said rehearing, issue our adjudication on the issue of whether the facts presented by Moon and BACS, with regard to the exist-

ence of the Water Quality Management Permit and with regard to their subsequent reliance upon said permit, create a situation where we should grant them an exception to this sewer connection ban on the theory that a situation has resulted which is equitably indistinguishable to exceptions granted by the department as a matter of policy.

## CONCLUSIONS OF LAW

1. The board has jurisdiction of the parties and the subject matter.

2. Neither Moon nor BACS presented evidence which would entitle either or both of them to an exception from the sewer connection ban of September 19, 1972, under the existing policies and procedures of the department.

3. Neither Moon nor BACS are entitled to an exception from the sewer connection ban of September 19, 1972, based solely upon the fact that they are custom home builders.

4. There is not sufficient evidence on the record in the matter for this board to determine whether Moon and BACS are entitled to an exception from the sewer connection ban of September 19, 1972, based upon the existence of Water Quality Management Permit no. 0970423 and based upon the subsequent reliance of Moon and BACS thereupon.

5. A rehearing of this matter is necessary for the sole purpose of determining whether the existence of said permit and the subsequent reliance thereupon by Moon and BACS create a situation which is equitably indistinguishable to exceptions granted by the department as a matter of policy.

## ORDER

And now, December 31, 1973, it is ordered that a prompt rehearing be held for the sole purpose of re-

ceiving evidence which will enable this board to determine whether Moon Nurseries, Inc., and BACS Realty, Inc., are entitled to an exception from the sewer connection ban of September 19, 1972, based upon the existence of Water Quality Management Permit no. 0970423 and based upon their subsequent reliance upon said permit.